UNITED STATES DISTRICT COURT
NORTHERN DISTRICT OF INDIANA
HAMMOND DIVISION

| | | |
|---|---|---|
| JAMES M. SWEENEY, DAVID A. FAGAN, | ) | |
| CHARLES C. SEVERS, JAMES C. OLIVER, | ) | |
| BRYAN SCOFIELD, EARL CLICK, JR. and | ) | |
| INTERNATIONAL UNION OF OPERATING | ) | |
| ENGINEERS, LOCAL 150, AFL-CIO, | ) | |
| | ) | |
|     Plaintiffs, | ) | |
| | ) | |
|     v. | ) | 2:12CV81-PPS/PRC |
| | ) | |
| MITCH DANIELS, Governor of the State | ) | |
| of Indiana, GREGORY ZOELLER, Attorney | ) | |
| General of the State of Indiana,  and LORI A. | ) | |
| TORRES, Commissioner of the Indiana | ) | |
| Department of Labor, | ) | |
| | ) | |
|     Defendants. | ) | |

## MEMORANDUM AND ORDER

On February 1, 2012, Indiana's governor signed into law House Enrolled Act No. 1001, thereby making Indiana the 23rd state to enact so-called "Right to Work" legislation. This case challenges that new law on a number of constitutional grounds.  The plaintiffs are Local 150 of the International Union of Operating Engineers and several of its officers and members.  In northwest Indiana, Local 150 represents approximately 4,000 members and has at least 200 collective bargaining agreements with construction industry employers and employers of other types. There are three defendants: Indiana's Governor, Attorney General, and Commissioner of Labor, all sued in their official capacity.

### *Indiana's New Right to Work Law*

The "Right to Work" label has a nice sound to it, but is misleading.  What these types of laws actually prohibit are "union security clauses," which are provisions in collective bargaining

agreements between labor unions and employers that condition employment on a worker joining

the union.  In addition, such clauses permit, as a substitute for union membership, requiring the

payment of fees to the union or, in the case of religious objection, making a substitute payment

to a charitable organization.  So it's not as if prior to the law's enactment certain people in

Indiana were prevented from working and the law suddenly gave them the "Right to Work."

Rather, it simply prevents forced union membership.

Indiana's new law is codified in the Indiana Code as §22-6-6 and titled "Chapter 6.

Right to Work."  The meatiest provision of the Indiana Right to Work law is §8, which spells out

its principal prohibitions:

> A person may not require an individual to:
>
> (1)     Become or remain a member of a labor organization;
> (2)     Pay dues, fees, assessments or other charges of any kind or amount to a
>          labor organization; or
> (3)     Pay to a charity or third party an amount that is equivalent to or a pro-rata
>          part of dues, fees, assessments or other charges required of members of a
>          labor organization;
>
> as a condition of employment or continuation of employment.

Also at issue in the present motion is §3 of the law.  It is a curious provision.  What it

says is that nothing in the law changes or affects "any law concerning" collective bargaining in

the building and construction industry other than a law that permits agreements requiring union

membership or the other two kinds of payments – laws requiring payments of dues to a union or

substitute payments to charities.  In other words, §3 seems to do the very same thing as §8 but

simply makes it clear that it applies specifically to the building and construction industry.  This

apparent redundancy in §3 and §8 is the subject of dispute between the parties and will be further

addressed below.

The last relevant provision of the law is §13 which makes it clear that §§8-12 of the Act apply only "to a written or oral contract(s) or agreement(s) entered into, modified, renewed, or extended after March 14, 2012." This means that, because the Act became effective on February 1, 2012, §§8-12 of the law apply only to contracts agreed to in the future, not to contracts already in existence. Note, however, that §13 does not mention §3 – the section dealing with the building and construction industry – and this drafting oddity, and the confusion it has engendered, is one of the primary disputes between the parties here.

### *Motion to Dismiss Standard*

To survive a motion to dismiss, "a complaint must contain sufficient factual matter, accepted as true, to state a claim to relief that is plausible on its face." *Ashcroft v. Iqbal*, 556 U.S. 662, 678 (2009). *See also Bell Atlantic Corp. v. Twombly*, 550 U.S. 544 (2007). Construing this standard, the Seventh Circuit advises that: "[i]n reviewing the sufficiency of a complaint under the plausibility standard announced in *Twombly* and *Iqbal*, we accept the well-pleaded facts in the complaint as true, but legal conclusions and conclusory allegations merely reciting the elements of the claim are not entitled to this presumption of truth." *McCauley v. City of Chicago*, 671 F.3d 611, 616 (7th Cir. 2011). And "the complaint must contain 'allegations plausibly suggesting (not merely consistent with)' an entitlement to relief." *McCauley*, 671 F.3d at 616, quoting *Twombly*, 550 U.S. at 557.

The Seventh Circuit has affirmed dismissals of constitutional claims under Rule 12(b)(6). See, e.g., *Hearne v. Board of Educ. of City of Chicago,* 185 F.3d 770, 774-76 (7th Cir.1999) (affirming Rule 12(b)(6) dismissal of §1983 claim against Illinois labor relations board and others challenging, on equal protection grounds, the constitutionality of amendments to state

3

statutes governing collective bargaining in the city of Chicago); *DeSalle v. Wright,* 969 F.2d 273, 275-77 (7th Cir.1992) (affirming Rule 12(b)(6) dismissal of §1983 claim against Illinois department of professional regulation challenging, on equal protection and due process grounds, the constitutionality of the Illinois Medical Practice Act); *Khan v. Gallitano,* 180 F.3d 829, 832 (7th Cir.1999) (affirming Rule 12(b)(6) dismissal of §1983 claim alleging that village officials violated plaintiff's rights under the contracts and due process clauses).

### *Proper Party-Defendants*

There is an initial squabble between the parties about who are proper party-defendants. The briefing is unnecessarily lengthy and complicated, and the parties have muddled multiple arguments on the subject including sovereign immunity under the 11th Amendment, prosecutorial immunity, legislative immunity, who are "persons" for purposes of §1983, "case or controversy" justiciability requirements, and so on.  The bottom line is that because the amended complaint seeks only declaratory and injunctive relief, this case can go forward under the exception to 11th Amendment immunity created by *Ex Parte Young,* 208 U.S. 123 (1908).   That case holds that a "private party can sue a state officer in his or her official capacity to enjoin prospective action that would violate federal law."  *Ameritech Corp. v. McCann*, 297 F. 3d 582, 585-86 (7th Cir. 2002), quoting *Ex Parte Young*, 209 U.S. 123 (1908).  The question then becomes who is the right state official to name as a defendant, and do we need more than one to restrain the State of Indiana from doing whatever this court determines would violate the federal constitution (if anything)?

Under *Ex Parte Young,* plaintiffs should name a state official who bears "legal responsibility for the flaws they perceive in the system" and not one from whom they "could not

ask anything...that could conceivably help their cause." *Hearne v. Bd. of Educ.*, 185 F.3d 770, 777 (7th Cir. 1999). In *Hearne*, the court held that governor was not a proper defendant because he had no role in the enforcement of challenged statutes and no power to nullify the enacted legislation. The same is true here. The Governor has no ability to enforce or nullify the Right to Work law. So he must be dismissed as a party. By contrast, both the Commissioner of Labor and the Attorney General have roles in the enforcement of the Right to Work law under §§10 and 11. As such, they are properly named as defendants.

**Contracts Clause and Ex Post Facto Clause – Counts I and X**

Counts I and X of the first amended complaint challenge the Right to Work law under the Contracts Clause and the *Ex Post Facto* Clause of the U.S. Constitution. As I alluded to earlier, the Union reads §3 of the Act to apply substantive provisions to existing contracts in the building and construction industry. This alleged impact on existing contracts that were legal when entered into is the linchpin of the Union's argument that the Right to Work statute violates the Contracts Clause and constitutes an *Ex Post Facto* law. But the State has responded with an emphatic denial that §3 means what the Union says it does. That is the first issue that needs to be explored because absent an immediate impact on an existing contract, the Contracts Clause and *Ex Post Facto* Clause arguments can go nowhere.

The Contracts Clause of Article I, §10 of the United States Constitution provides: "No State shall...pass any...Law impairing the Obligation of Contracts." The Supreme Court has held that the Contracts Clause puts "*some* limits on the power of the state to abridge existing contractual relationships . . ." *Allied Structural Steel Company v. Spannaus*, 438 U.S. 234, 242 (1978) (emphasis in original). A claim under the Contracts Clause examines first whether the

5

challenged law works a substantial impairment of a contractual relationship; second, whether the law has a significant and legitimate public purpose; and third, whether the law is reasonable and appropriate in furtherance of that purpose.  *Energy Reserves Group, Inc. v. Kansas Power and Light Company*, 459 U.S. 400, 411-412 (1983).  But the key point for our purposes is that the law must impact an *existing* contractual relationship.

The *Ex Post Facto* Clause works in a similar fashion.  "The *ex post facto* prohibition forbids the Congress and the States to enact any law 'which imposes a punishment for an act which was not punishable at the time it was committed; or imposes additional punishment to that then prescribed.'"  *Weaver v. Graham*, 450 U.S. 24, 28 (1981), quoting *Cummings v. Missouri*, 4 Wall. 277, 325-26, 18 L.Ed. 356 (1867).  The prohibition on *ex post facto* legislation is intended to insure that existing law can be relied upon until fair warning is given of changes to the law.  *Id.* at 28-29.  "[T]wo critical elements must be present for a criminal or penal law to be *ex post facto*: it must be retrospective, that is, it must apply to events occurring before its enactment, and it must disadvantage the offender affected by it."  *Id.* at 30.

The State argues that the Contracts Clause and *Ex Post Facto* claims are defeated because the Right to Work law applies prospectively only:  "the fact is that the Right-to-Work law does not apply to contracts that were in effect on March 14, 2012, nor does it retroactively impose sanctions against those who entered such contracts before that date."  [DE 66, p.2, pp.14*ff*].  Indeed, Labor Commissioner Torres filed a very clear Declaration on this point [DE 17-1] in response to plaintiffs' Emergency Motion for Temporary Restraining Order (which the Union later withdrew). That declaration makes it clear that the State has no intention of enforcing the Right to Work law on contracts in existence on the date the law was passed; it will only be

enforced on contracts entered into after the law was passed. [*Id.* at 2, ¶ 8.] This is what makes the Union's insistence that  "*[t]here is no dispute that* the Indiana Right to Work law is intended to apply to existing contractual relationships" so hard to understand. [DE 69, p.22 (emphasis added)]. Indeed, at bottom, that's *the entire dispute* between the parties.

The State treats sections 8-12 as "the substantive provisions of the law" and points out that §13 expressly indicates those sections apply only to agreements "entered into, modified, renewed, or extended after March 14, 2012" and "do not apply to or abrogate a written or oral contract or agreement in effect on March 14, 2012."  Because the Right to Work law was enacted on February 1, 2012, under the State's view there is no retrospective effect as would be necessary to constitute a Contracts Clause or *Ex Post Facto* violation.

The State is correct; it is abundantly clear that §§8-12 do not apply retroactively.  But what about §3?  The statute doesn't explicitly say one way or the other.  For a number of reasons I find that §3 of Indiana's Right to Work law is not a substantive provision applying different content or a different effective date to the building and construction industry than to other industries.  First, as just mentioned, the State (via its Commissioner of Labor) is on record in this litigation disclaiming any reading of §3 as intending, creating or supporting any distinction in the Act's application to the building and construction trades versus any other industry.  Declaration of Lori A. Torres, DE 17-1, ¶5.   As a result of this, the State will be judicially estopped from taking any contrary position in the future, such as by any attempt to enforce the Right to Work law against pre-existing contracts in the construction industry.

My reading of §3 is also supported by the context and content of that provision within the overall structure of the Right to Work Act.  §3 lies in the middle of seven preliminary sections of

the new law, each of which serves in some way to explain the scope of the Act.  Section 1

enumerates categories of employees to whom the Act does not apply.  Section 2 disclaims the

Act's intention to override any contrary federal law.  Sections 4, 5,6 and 7 define the terms

"employer," "labor organization," "person," and "the state."  Section 3's placement within these

sections is entirely consistent with the State's position, reading §3 as intending merely to clarify

the parameters of the Act.

> The wording within §3 also supports this interpretation.  Section 3 reads:
>
> Nothing in this chapter is intended, or should be construed, to change or affect
> any law concerning collective bargaining or collective bargaining agreements in
> the building and construction industry other than:
>
> (1)       a law that permits agreements that would require membership in a labor
> organization;
> (2)       a law that permits agreements that would require the payment of dues,
> fees, assessments, or other charges of any kind or amount to a labor organization;
> or
> (3)       a law that permits agreements that would require the payment to a charity
> or a third party of an amount that is equivalent to or a pro rata part of dues, fees,
> assessment, or other charges required of members of a labor organization;
>
> as a condition of employment.

Like §§1 and 2 before it, §3 explains limits on the Right to Work law's application.  By saying

that the chapter is not "intended to affect" certain other laws, §3 is worded as a disclaimer about

the legislation's impact on other existing laws governing collective bargaining in the

construction industry.  A substantive provision designed to forbid or permit certain CBA terms

would not sensibly be worded this way.

> Why such a disclaimer might have been included in the law becomes even more clear

when one considers that different treatment of the building trades in national labor policy is well

established.  For example, the Supreme Court has noted that the NLRA contains "exemptions

8

authorizing certain kinds of project labor agreements in the construction industry" because conditions specific to the building trades need to be accommodated.  *Building and Const. Trades Council of Metropolitan Dist. v. Associated Builders & Contractors of Massachusetts/Rhode Island, Inc.*, 507 U.S. 218, 231 (1993).  For example, as the Union acknowledges, the NLRA allows construction CBAs to require joining the union within 7 days, whereas the limit is 30 days for other industries.  *See* 29 U.S.C. §158(f).  The reason for the different treatment is obvious: the construction industry, unlike many other industries, can be temporary, seasonal and cyclical by its very nature.

The record here suggests that in the buzz surrounding consideration of the Right to Work legislation, there was talk about whether or not the building trades would be included.  The Declaration filed in the case by plaintiff David Fagan, Local 150's Financial Secretary, supports the explanation given by the State about needing to address rumors during the legislative process about a "carve-out" for the construction industry. [DE 15-1, ¶17].  In the context of such rumors and in light of the fact that the construction industry is sometimes treated differently in labor law, it is understandable that the legislation would have attempted to address whether the building trades are treated any differently.  They are not. The unfortunate and clumsy wording of §3 is obviously not ideally suited for the purpose.  Fagan acknowledges in his Declaration that he has himself characterized §3 as "not in fact a carve-out," but instead "that it's (sic) convoluted language really meant nothing."  *Id*.  I couldn't agree more.  Rather than a "carve-out," §3 functions as the opposite: a declaration that the Act *does not affect* the construction industry other than as set out in the later substantive sections outlawing union security clauses.

As for the issue of immediate application to the construction industry, the §3 disclaimer language refers repeatedly to laws permitting agreements "that would require" union membership or payments of several kinds.   That conditional progressive verb formulation is inherently prospective in nature, and contrasts sharply with the declarative verbs of the substantive §§8 and 9, which provide what a person "may not require" and when a contract "is unlawful and void."

My interpretation that §3 is not a substantive provision and not retroactive is also supported by canons of statutory construction.  First is the presumption against retroactive application.  *Vartelas v. Holder*, 132 S.Ct. 1479, 1486 (2012).  "The presumption against retroactive legislation...' embodies a legal doctrine centuries older than our Republic.' Several provisions of the Constitution...embrace the doctrine, among them, the *Ex Post Facto* Clause, the Contract Clause, and the Fifth Amendment's Due Process Clause."  *Vartelas*, 132 S.Ct. at 1486, quoting *Landgraf v. USI Film Products*, 511 U.S. 244, 265-66 (1994).  The second rule is the canon of constitutional avoidance, under which every reasonable construction must be resorted to in order to save a statute from unconstitutionality.   *Edward J. DeBartolo Corp. v. Florida Gulf Coast Bldg. & Constr. Trades Council*, 485 U.S. 568, 575 (1988).  To read §3 to outlaw construction industry agreements that were legal when entered into would run afoul of these rules.   If I accepted the Union's strained interpretation of §3, I would have to ignore these doctrines of statutory construction.

Based on the State's binding admissions, the context and content of the statutory text, and relevant canons of legislative interpretation, I find that §3 of Indiana's Right to Work law contains no substantive content and is intended merely to confirm that the law applies to the

10

building and construction trades in exactly the same manner and to the same extent as to any other industry. Because it is then clear that the Act only applies to contracts formed after March 14, 2012, Count I of the Amended Complaint brought under the Contracts Clause, and Count X under the *Ex Post Facto* Clause, are subject to dismissal.

### *Equal Protection  –  Counts II, III and IV*

The Equal Protection Clause of the Fourteenth Amendment provides that no state shall "deny to any person within its jurisdiction the equal protection of the laws." U.S. Const. amend. XIV. When reviewing state laws, I start from the proposition that a legislature is generally presumed to have acted within its constitutional authority. *Nordlinger v. Hahn*, 505 U.S. 1, 10 (1992). If a law implicates some fundamental right or imperils a suspect class, then it will be subject to the so-called "strict scrutiny" analysis. *Vision Church v. Village of Long Grove*, 468 F.3d 975, 1000 (7th Cir. 2007). But in the absence of a suspect class or impact on a fundamental right, a law is reviewed under the lower and less demanding standard of "rational basis" which merely asks whether a law is rationally related to a legitimate state interest. *Id*. at 1000-01.

The Supreme Court has long ago indicated that union membership is not a suspect classification triggering the strict scrutiny standard:

> Since it is not here asserted and this Court would reject such a contention if it were made that respondents' status as union members....is such as to entitle them to special treatment under the Equal Protection Clause, the city's practice must meet only a relatively relaxed standard of reasonableness in order to survive constitutional scrutiny.

*City of Charlotte v. Local* 660, 426 U.S. 283, 286 (1976). In the face of this rather clear authority, the Union nonetheless contends that the Equal Protection analysis involves the strict scrutiny standard for two reasons. The first is that "[u]nion membership is a fundamental right

because it involves the exercise of the freedoms of association and assembly." [DE 69, p.24] But as the Tenth Circuit has held, this assertion is defeated by the Supreme Court's contrary indication in *City of Charlotte*.   "[N]either union nor non-union status implicates a fundamental right or constitutes a protected class, so that a statute which addresses or favors one group over another need only reflect a rational basis." *Local 514 v. Keating*, 358 F.3d 743, 754 (10th Cir. 2004), citing *City of Charlotte*, 426 U.S. at 286.

Second, the Union argues that "[t]he exercise of free speech by the union is also a fundamental right" [DE 69, p. 26] and by permitting "free riders" the Right to Work law restricts the channel of income that supports the Union's protected political speech.  But this very argument has been considered and rejected by the Supreme Court when it held that "a legislature's decision not to subsidize the exercise of a fundamental right does not infringe the right, and thus is not subject to strict scrutiny." *Regan v. Taxation with Representation*, 461 U.S. 540, 549 (1983).  In arriving at this conclusion, the Court in *Regan* said that although the plaintiff in that case may not "have as much money as it wants, and thus cannot exercise its freedom of speech as much as it would like, the Constitution 'does not confer an entitlement to such funds as may be necessary to realize all the advantages of that freedom.'" *Id.*, quoting *Harris v. McRae*, 448 U.S. 297, 318 (1980).

Because strict scrutiny is inapplicable here, the Right to Work law is subject to rational basis review which places the burden squarely on the party challenging the constitutionality of the statute to negate "every conceivable basis which might support it." *Armour v. City of Indianapolis*, 132 S.Ct. 2073, 2080-81 (2012) (internal citations omitted).  The standard is a monster to overcome; the challenger "must demonstrate 'governmental action wholly impossible

12

to relate to legitimate governmental objectives.'" *Vision Church*, 468 F.3d at 1001, quoting *Patel v. City of Chicago*, 383 F.3d 569, 572 (7th Cir. 2004).  In a Right to Work context, applying rational basis review, the Tenth Circuit has said:

> [F]or defendants to prevail on their claim that the Fourteenth Amendment mandates mutuality in the treatment of union and non-union workers they must demonstrate that it would be irrational for a state to only provide protection against employment discrimination to non-union workers.  In light of the federal protection provided to union members under the NLRA, defendants cannot make any such showing.

*Local 514*, 358 F.3d at 754.

The Union points to the fact that there is no statement of purpose in the Right to Work law.  So, what?  "The Equal Protection Clause does not demand for purposes of rational-basis review that a legislature or governing decisionmaker actually articulate at any time the purpose or rationale supporting its classification."  *Nordlinger*, 505 U.S. at 15.  Indiana's legislative choice is "not subject to courtroom fact-finding and may be based on rational speculation unsupported by evidence or empirical data."  *FCC v. Beach Communications, Inc.,* 508 U.S. 307, 315 (1993).

The Union has itself supplied an adequate rational basis for Indiana's Right to Work law by submitting news reports concerning Indiana's passage of the Act, in which legislators, the Indiana Chamber of Commerce and others identify an economic development rationale in support of the bill. [DE 15-1, pp. 12, 14, 15].  A belief that the passage of Right to Work legislation contributes to a business-friendly environment that can attract companies and encourage job growth provides a legitimate governmental objective that may have been (and was in fact claimed to be) a reason for the passage of Indiana's Right to Work legislation.  An Equal Protection challenge looks no further and does not authorize me to weigh that rationale and

13

determine whether it is sound or unsound, or to consider whether that rationale was even the genuine motivation of any or all of the majority of legislators who voted in favor of the Act's passage. "Equal protection is not a license for courts to judge the wisdom, fairness or logic of legislative choices." *Beach Communications*, 508 U.S. at 313.

Because there exists a plausible public policy reason for enacting the Right to Work statute based on economic theories which the legislators may have believed to be true, and the relationship of that rationale to the legislation is not arbitrary or irrational, the Equal Protection challenge fails. *Nordlinger*, 505 U.S. at 11. Whether I think this law constitutes wise governance simply doesn't matter. If a mistake has been made in passing the law, it is for the citizens to fix through the democratic process. *Nordlinger*, 505 U.S. 17-18. Because the rational basis test applies, I readily conclude that the Equal Protection challenge to §8 of the Right to Work law fails because of the economic development purpose which could and did support its passage.

Turning to more specific arguments directed to other provisions of the new law, Count III is the Equal Protection challenge to §3 of the new statute, based on the Union's contention that §3 treats the construction industry differently from other industries by providing a "carve-out" allowing "Maintenance of Membership" clauses in the building trades. As in their argument under the Contracts Clause, the State argues that Count III is subject to dismissal because §3 is merely clarifying and not a substantive provision treating the construction industry differently from others. I persist in my belief (stated above and also expressed at oral argument) that §3 is sloppily worded and ultimately utterly duplicative. But as earlier indicated, I also readily conclude – for all the reasons explained in the earlier discussion of the *Ex Post Facto* and

14

Contracts Clause claims – that §3 of Indiana's Right to Work law contains no substantive content and is intended merely to confirm that the law applies to the building and construction trades in exactly the same manner and to the same extent as to any other industry.  In the absence of a distinction between industries, no Equal Protection violation can be supported.

But let's assume for the moment that §3 does make a distinction for the building industry as to "Maintenance of Membership" provisions.  There would still be no Equal Protection violation because the distinction would be entirely rational.  As stated above, different treatment for the construction industry in several aspects of labor policy is rationally based on the differences in the nature of work in those trades, as the Supreme Court has itself recognized. *Building and Const. Trades Council*, 507 U.S. at 231.  So – if it existed – any  differential treatment in the Right to Work law relating to Maintenance of Membership clauses in union contracts in the construction industry would be entirely rational.

The Union's final Equal Protection challenge in Count IV is directed to the Right to Work law's distinction between public and private employees, found in §1(5) of the Act.  Under §1, the statute expressly provides that it does not apply to state employees or to employees of a "political subdivision."  Count IV's challenge is based on the assertion that under the new law, members of Local 150 who are employees of the City of Portage, Indiana could be subjected to a CBA that allowed a "free rider" option but not for public employees.  In opposition to the motion to dismiss, the Union doesn't argue that the definition's exclusion of public employees lacks a rational basis, but only that it doesn't pass strict scrutiny analysis. [DE 69, p.31].

The exclusions in §1 of the Right to Work law mirror those found in the NLRA's definition of "employer" in  29 U.S.C. §152(2). Because federal law distinguishes between

public and private employees, the State's law may rationally do the same.  Noting the exclusion

of public employees from the NLRA's definition of employer in §152(2), the Supreme Court has

observed that "[t]he National Labor Relations Act leaves regulation of the labor relations of state

and local governments to the States."  *Abood v. Detroit Bd. of Ed.*, 431 U.S. 209, 223 (1977).

There is of course a major difference between private and public employment. The economic

development rationale behind the Right to Work law applies to the former but not the latter.  So

it is altogether sensible for the legislature to have excluded state and municipal employees from

the Right to Work law.

To summarize: the Right to Work law cannot be found to violate the Equal Protection

Clause "'unless in the light of the facts made known or generally assumed it is of such a

character as to preclude the assumption that it rests upon some rational basis within the

knowledge and experience of the legislators.'" *Armour*, 132 S.Ct. at 2080, quoting *United States*

*v. Carolene Products Co.*, 304 U.S. 144, 152 (1938).  Under this deferential standard, the

Union's Equal Protection challenges to §§8, 3 and 1(5) of Indiana's Right to Work law fail.

Counts II, III and IV will therefore be dismissed.

### Preemption Claims – Counts V, VI, VII and XI

Federal labor law has a good deal of preemptive power.  But in one respect very

important to this case Congress ceded some of that power and authorized the states to disagree

with national labor policy.   Section 8(a)(3) of the National Labor Relations Act (29 U.S.C.

§158(a)(3)) expressly allows union security provisions in collective bargaining agreements

(under certain prescribed conditions): "nothing in this subchapter, or in any other statute of the

United States, shall preclude an employer from making an agreement with a labor

16

organization...to require as a condition of employment membership therein...."  Nonetheless, §14(b) of the NLRA (29 U.S.C. §164(b)) expressly allows states to *disallow* what §8(a)(3) permits: "Nothing in this subchapter shall be construed as authorizing the execution or application of agreements requiring membership in a labor organization as a condition of employment in any State or Territory in which such execution or application is prohibited by State or Territorial law."  As the Supreme Court has observed, "(It) is immediately apparent from its language, (that) §14(b) was designed to prevent other sections of the Act from completely extinguishing state power over certain union-security arrangements."  *Retail Clerks Int'l Ass'n, Local 1625 v. Schermerhorn*, 373 U.S. 746, 751 (1963) [*Retail Clerks I*].

The same day that the Supreme Court decided *Retail Clerks I*, it also decided *National Labor Relations Board v. General Motors*, 373 U.S. 734, 741-43 (1963), in which it held that an "agency shop" agreement under which employees are required to pay initiation fees and regular dues to the union is the "practical equivalent" of an agreement requiring membership in the union as a condition of employment, and so is within the permissive ambit of §8(a)(3).  In *Retail Clerks I*, the Supreme Court found that such an agreement is therefore also within the scope of §14(b) and subject to a State's power to forbid.  *Retail Clerks I*, 373 U.S. at 751-52.

The Union's efforts to diminish the force or applicability of these precedents to the current Indiana legislation are unsuccessful.  Count V of the first amended complaint challenges §8(2) of the Act, the prohibition against requiring individuals to "pay dues, fees, assessments, or other charges of any kind or amount to a labor organization."  *Retail Clerks I* clearly supports the State's position that, far from the NLRA preempting the Indiana provision, §14(b) of the NLRA as construed by the Supreme Court expressly permits it.

17

Count VI of the first amended complaint attacks §10 of the Act, which makes it a misdemeanor to violate §8 of the Act.  The Union argues that adding a criminal penalty goes beyond what §14(b) of the NLRA leaves to the States, and so is preempted. [DE 69, p.49].[1]  The Union cites *Wisc. Dep't of Industry v. Gould*, 475 U.S. 282 (1985) and *San Diego Bldg. Trades v. Garmon*, 359 U.S. 236 (1959), for the proposition that "state efforts to impose additional remedies for unfair labor practices are preempted." [DE 69, p.49].  However true that proposition might be in other contexts, it does not hold true in the area of §14(b) and what it reserves to the States.  In the second *Retail Clerks* opinion in 1963, the Supreme Court distinguishes *Garmon* from the §14(b) context:

> In light of the wording of §14(b) and this legislative history, we conclude that Congress in 1947 did not deprive the States of any and all power to enforce their laws restricting the execution and enforcement of union-security agreements. Since it is plain that Congress left the States free to legislate in that field, we can only assume that it intended to leave unaffected the power to enforce those laws.

*Retail Clerks Int'l Ass'n, Local 1625 v. Schermerhorn*, 375 U.S. 96, 102 (1963) [*Retail Clerks II*].  Indiana's determination to provide for enforcement of its Right to Work law by means of a misdemeanor penalty is not preempted by the NLRA, and Count VI is therefore subject to dismissal.

In Count VII of the amended complaint, the Union claims that §8(3) of the Act – the provision relating to religious objectors – is preempted.  This is so according to the Union because §19 of the NLRA (29 U.S.C. §169) expressly allows union security provisions for such

---

[1]  The Union's argument here actually goes beyond the criminal penalties (and beyond the scope of the pleadings) and contends that the same preemption analysis applies to the civil lawsuit enforcement mechanism provided in §12 of the Act. [DE 69, p.49].  But Count VI of the first amended complaint doesn't challenge §12, only §10. [DE 62, pp.17-18].

payments to charity by conscientious objectors.   Because §19 of the NLRA was enacted after §14(b), the Union contends that §19 is "an exception to the National Labor Policy which allowed the states to regulate union security clauses" [DE 69, p.55]

 The Union's argument does not fare well as a matter of statutory interpretation.  The NLRA's §8(a)(3) says that nothing in that subchapter or any other federal statute shall preclude certain union security provisions being agreed upon between labor and management.  Section 14(b) was enacted later to clarify that nothing in the subchapter authorizes such an agreement where state law prohibits it.  Still later, §19 was enacted to indicate that for those with religious objections to financially supporting labor unions, union security provisions have to provide what has been called a substitute charity accommodation, in the form of allowing for payment of the otherwise required sums to a charity rather than to the union.  Nothing in the language of §19 suggests or supports interpreting it as an exception to §14(b) that would preempt any state attempt to outlaw the kind of provision that §19 permits.

 Statutes are to be read "in their context and with a view to their place in the overall statutory scheme."  *FDA v. Brown & Williamson Tobacco Corp.*, 529 U.S. 120, 133 (2000).

> The legislature is presumed to intend a consistent body of law.  In accord with this principle, subsequent legislation is not presumed to repeal existing law in the absence of expressed intent.  Courts are reluctant to find repeal by implication even when the later statute is not entirely harmonious with the earlier one.  If two statutes conflict somewhat, courts must, if possible, read them so as to give effect to both, unless the text or legislative history of the later statute shows that Congress intended to repeal the earlier one and simply failed to do so expressly.

Norman J. Singer & J.D. Shambie Singer, *Statutes and Statutory Construction*, §23:9, pp. 454 - 458 (rev. 7th ed. 2009).  Construing §19 as an exception to §14(b) would give it the effect of an implied amendment to, or partial repeal of, §14(b).  *Kremer v. Chemical Construction*

*Corporation*, 456 U.S. 461, 468 (1982) [an exception to an existing statute requires "an express or implied partial repeal"]. And "implied amendments to statutes – like implied repeals – are not easily found." *Brotherhood of Maintenance of Way Employees v. CSX Transportation, Inc.*, 478 F.3d 814, 818 (7ᵗʰ Cir. 2007). "We are often reminded that 'when two statutes are capable of co-existence, it is the duty of the courts...to regard each as effective.'" *Id.*, quoting *Radzanower v. Touche Ross & Co.*, 426 U.S. 148, 155 (1976). Where two statutes are reconcilable, this canon of construction defeats an implied exception. *Brotherhood*, 478 F.3d at 818.

The substituted charity accommodation provided for in §19 no more conflicts with §14(b) than the earlier §8(a)(3) does. If anything, §19 can logically be read as an amendment to §8(a)(3); that is, it adds one more proviso on what federal law allows in the way of union security agreements. None of that is in any way irreconcilable with the provision of §14(b), which allows States *carte blanche* to prohibit such agreements. The mere timing of the enactments does not, under established statutory construction principles, support Count VII's conclusion that §19 preempts §8(3) of Indiana's Right to Work law. *National Ass'n of Home Builders v. Defenders of Wildlife*, 551 U.S. 644, 662 (2007) (a later enacted statute will not be presumed to amend an earlier statutory provision unless the intention of the legislature is clear and manifest). Count VII will be dismissed.

Last and most recent of the Union's preemption claims is Count XI, added in the first amended complaint, which challenges the definition of "employee" found in both an Emergency Rule and a Proposed Rule of the Indiana Department of Labor issued in the wake of the Right to Work Act. The State argues that the claim is moot because that definition is not found in the Final Rule that has now been promulgated. [DE 66, p.23]. In its briefing, however, the Union

contends that the Department of Labor's decision to delete the challenged definition "is obviously in response to this Court's Order granting Plaintiffs' Motion to Amend their Complaint" and that the Union is therefore the prevailing party on Count XI and entitled to attorney's fees. [DE 69, p.58].

Without a court-ordered victory (either a judgment or at least a consent decree), the Union is not a prevailing party. The "catalyst" theory is dead under *Buckhannon Board and Care Home, Inc. v. West Virginia Dep't of Health and Human Resources*, 532 U.S. 598, 600 (2001); see also *Federation of Advertising Industry Representative, Inc. v. City of Chicago*, 326 F.3d 924 (7th Cir. 2003). The Union can't establish an entitlement to attorney's fees on Count XI based on the wording of the Final Rule.

To sum up: the Union's preemption challenges to §§8(2), 8(3), 10 and the Emergency Rule all run headlong into the Supreme Court's *Retail Clerks II* decision:

> As already noted, under §8(a)(3) a union-security agreement is permissible...Yet even if the union-security agreement clears all federal hurdles, the States by reason of §14(b) have the final say and may outlaw it. There is thus conflict between state and federal law; but it is a conflict sanctioned by Congress with directions to give the right of way to state laws barring the execution and enforcement of union-security agreements.

*Retail Clerks II*, 373 U.S. 102-03. Counts V, VI, VII and XI of the amended complaint will therefore be dismissed.

21

***Indiana Constitution – Counts VIII and IX***

Counts VIII and IX of the amended complaint allege that the Right to Work law violates various provisions of the Indiana Constitution.  Under *Pennhurst State Sch. & Hosp. v. Halderman*, 465 U.S. 89, 106 (1984), it is clear that claims against state officials under state law can't be brought in federal court because such claims would violate "the principles of federalism that underlie the 11th Amendment."  The Union's response at oral argument was an invocation of judicial economy and in its briefing is a weak assertion that subsequent caselaw suggests that "*Pennhurst* has dubious continuing vitality." [DE 69, p.56]

To begin with, there really isn't much savings in judicial resources here given that this case is still in its infancy.  This is another way of saying that, with the federal claims all dismissed at an early stage of the case, I would likely relinquish jurisdiction over the state claims.  But even if I were to view the matter differently, prudential concerns of judicial economy cannot trump the Eleventh Amendment.  As for *Pennhurst* having been called into question, the Seventh Circuit has this year restated it clearly:  "[I]t is not possible to sue an arm of state government in federal court to vindicate a claim under state law." *Chicago Tribune Company v. Board of Trustees of the Univ. of Ill.*, 680 F.3d 1001, 1002-03 (7th Cir. 2012), citing *Pennhurst*.  Counts VIII and IX will be dismissed without prejudice to being litigated in state court.

***Conclusion***

For better or worse, the political branches of government make policy judgments.  The electorate can ultimately decide whether those judgments are sound, wise and constitute good governance, and then can express their opinions at the polls and by other means.  But those are

questions beyond the reach of the federal court, which instead is limited to analysis of particular

legal arguments that the challenged legislation runs afoul of preemptive federal labor law or the

U.S. Constitution.  None of the legal challenges launched by the Union here to attack Indiana's

new Right to Work law can succeed.

**ACCORDINGLY:**

Defendants' Motion to Dismiss the First Amended Complaint [DE 65] is GRANTED.

The Clerk shall enter judgment dismissing Counts VIII and IX without prejudice to being

litigated in state court, dismissing Count XI as moot, and dismissing all remaining counts for

failure to state a claim upon which relief can be granted.

**SO ORDERED.**

**ENTERED:   January 17, 2013.**

       **/s/ Philip P. Simon          **
       **PHILIP P. SIMON, CHIEF JUDGE**
       **UNITED STATES DISTRICT COURT**